1   UNITED STATES DISTRICT COURT

2   EASTERN DISTRICT OF NEW YORK

3   - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

4   MATTHEW RUSSELL, ON BEHALF OF HIMSELF AND ALL OTHERS

5   SIMILARLY SITUATED,

6                              Plaintiff,

7       -against-            Civil Action No. 2:17-cv-4274

8   FORSTER & GARBUS, LLP, LVNV FUNDING, LLC, SHERMAN

9   FINANCIAL GROUP, LLC, MARK A. GARBUS, AND RONALD

10  FORSTER,

11                           Defendant.

12  - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

13      A Telephone Deposition held at 71 State Street,

14  Binghamton, New York, on the 21st day of February,

15  2019, commencing at 9:04 AM.

16

17                 BEFORE:   CZERENDA COURT REPORTING, INC.
                             71 State Street
18                           Binghamton, New York 13901-3318
                             KEVIN CALLAHAN
19                           Shorthand Reporter
                             Notary Public
20                           Binghamton - (607) 723-5820
                                          (800) 633-9149
21

22

23

24  WITNESS:  MATTHEW RUSSELL

1                    A P P E A R A N C E S

2

3          MITCHELL L. PASHKIN, ESQ; 775 Park Avenue, Suite

4     255, Huntington, New York 11743; Counsel for Plaintiff

5     (via telephone)

6

7          LAW OFFICE OF ROBERT L. ARLEO, ESQ, PC;

8     380 Lexington Avenue, 17th Floor, New York New York

9     10168; Counsel for Defendants - Forster & Garbus, Mark

10    Garbus and Ronald Forster; ROBERT L. ARLEO, ESQ, of

11    Counsel (via telephone).

12

13

14

15

16                   S T I P U L A T I O N S

17

18          It is stipulated by and between the parties

19    hereto that the deposition will be held pursuant to the

20    Civil Rules of Federal Court, Eastern District of New

21    York; and that the deposition may be signed before any

22    Notary Public.

23

24

Matthew Russell by Mr. Arleo

1    M A T T H E W    R U S S E L L,  having been called as

2    a witness, being duly sworn, testified as follows:

3    EXAMINATION BY

4    MR. ARLEO:

5         Q.   Good morning, Mr. Russell.  My name is Robert

6    Arleo.  I represent Forster & Garbus, Mark Garbus and

7    Ronald Forster.

8                    MR. ARLEO:   Okay.  Now I'm getting

9               some static on the line.

10                   (Whereupon a short break was taken)

11   BY MR. ARLEO:

12        Q.   Mr. Russell, my name is Robert Arleo, and

13   I've advised you I represent Forster & Garbus, Mark

14   Garbus and Ronald Forster in a federal lawsuit that's

15   been brought.

16              Have you ever been deposed before?

17        A.   No.

18        Q.   Are you under any medication which could

19   affect your ability to testify today?

20        A.   No.

21        Q.   Okay.  The process is I'll ask a question.

22   You have to wait until I'm finished.  The court

23   reporter that is with you cannot write down what we are

24   saying if we're talking at the same time.  So, as you

4

Matthew Russell by Mr. Arleo

1 see, you are physically in -- I'm sorry.

2        MR. ARLEO:   You're in Rochester,

3    Mr. Court Reporter?

4        THE WITNESS:   No.  We're in

5    Binghamton, New York.

6        MR. ARLEO:   Okay.

7    Q.   So, you're in Binghamton.  I am deposing you

8 by telephone.  Your attorney, Mr. Pashkin, is also

9 participating telephonically.  So, if you don't

10 understand any of my questions, I'll be happy to

11 rephrase it.  Sometimes your attorney might come in

12 with an objection.  You have to wait until he's done

13 finishing.  So, it's a process, and I'm sure you'll get

14 used to it as we go along.

15    Did you bring any documents with you today?

16    A.   No.

17    Q.   And who have you spoken to about this

18 deposition?

19    A.   My wife and my lawyer.

20    Q.   Who's your lawyer?

21    A.   Mitchell Pashkin.

22    Q.   Can you just give me our education, please.

23    A.   High school education.

24    Q.   Okay.  And anything after high school?

Matthew Russell by Mr. Arleo

| | | |
|---|---|---|
| 1 | A. | No, sir. |
| 2 | Q. | Where are you employed, Mr. Russell? |
| 3 | A. | ███████████████████████ |
| 4 | Q. | And what do you do there? |
| 5 | A. | I'm the head bartender. |
| 6 | Q. | I'm sorry.  I didn't get the name of the |

place where you worked at.

| | | |
|---|---|---|
| 8 | A. | Sure.  ██████████████████ |
| 9 | Q. | And do you have a street address for that, |

please?

| | | |
|---|---|---|
| 11 | A. | ████████████████████████ |
| 12 | Q. | Okay.  And how long have you been a |

bartender?

14      A.    I'd be guessing the exact amount of years.
I'm going to say 30 to 35 years.

16      Q.    Okay.  Have you ever been fired from any
bartending position?

18      A.    No, sir.

19      Q.    And how long have you been working at
Lampy's?

21      A.    Since 2010.

22      Q.    Who's your supervisor there?

23      A.    ████████████████

24      Q.    Is he the owner or the manager?

6

Matthew Russell by Mr. Arleo

1          A.    General manager.

2          Q.    Okay.  And how were cash transactions --

3                      (Whereupon there was an outside

4                interruption)

5     BY MR. ARLEO:

6          Q.    And how are the purchase transactions, how

7     would they occur at the bar?

8          A.    I don't understand the question.

9          Q.    Okay.  You're serving people drinks at the

10    bar.  How do the people pay for those drinks?

11         A.    By credit card or cash.

12         Q.    Mr. Russell, you've been a bartender for

13    30 years.  Are you aware of the general knowledge that

14    bartenders sometimes engage in improper activity

15    concerning giving liquor away or other improprieties

16    that go against management?

17         A.    Yes.

18         Q.    Okay.  So, you're aware of that, correct?

19         A.    I'm aware of that, yes.

20         Q.    And describe what that problem is, please.

21         A.    It all boils down to theft.

22         Q.    And how is that theft -- how does that occur?

23         A.    I don't know.

24         Q.    Well, you said you had a general

Matthew Russell by Mr. Arleo

1   understanding as to the bartending profession

2   concerning potential theft.  So, I'm asking you to

3   describe what the potential for theft is in conjunction

4   with the bartending profession.

5        A.    I don't know because I do not do that.

6        Q.    Okay.  But that's two answers, you don't know

7   or you don't do that.  When you testified that you were

8   aware of the problem, I'm not asking you if you do

9   that.  I'm asking you to explain what that problem is.

10       A.    Again, what I'm saying is it's an assumption

11  that I do not believe in or do.

12       Q.    And what is that?  Can you describe what that

13  assumption is.

14       A.    That all bartenders are thieves.

15       Q.    Well, that was not my question nor my

16  accusation.  I'm just saying your general understanding

17  as to issues that may arise in conjunction with the

18  bartending profession, and you stated it revolves

19  around theft, correct?

20       A.    That's the assumption.

21       Q.    Okay.  And what type of theft are we talking

22  about?

23       A.    I would assume what -- I think if we're on

24  the same page here, we're saying product and money.

Matthew Russell by Mr. Arleo

1       Q.   Okay.  Is there a distinction between the

2  two?

3       A.   I guess if you look at it no is where if

4  somebody is given drinks without paying, that's money,

5  as well, out of the owner's pocket, or not ringing in

6  the product and taking the money, that's theft, as

7  well.

8       Q.   Okay.  And you've never done either of those?

9       A.   No, sir.

10      Q.   Have you ever filed for bankruptcy?

11      A.   Yes.

12      Q.   And when did you file for bankruptcy?

13      A.   Exact date I don't know.  I'd be guessing.

14      Q.   Was it in the last year?

15      A.   No.

16      Q.   2018?

17      A.   No.

18      Q.   2017?

19      A.   No.

20      Q.   Was it more than five years ago?

21      A.   Again, I don't know for sure, but I'd be

22  guessing, yes.

23      Q.   Okay.  How about your best estimate as to

24  when that bankruptcy was filed?

Matthew Russell by Mr. Arleo

1        A.   Again, I don't know.  I'd be giving you the
2   wrong answer.
3        Q.   Do you remember what court the bankruptcy was
4   filed in?
5        A.   I don't know.
6        Q.   Do you remember the name of your attorney who
7   represented you in that bankruptcy?
8        A.   Yes.
9        Q.   And what was his or her name, please?
10       A.   Peter Orville.
11       Q.   And do you know where his office is?
12       A.   Again, I -- I'm going to be -- I'm assuming
13   that I know the name of the street.  I believe it's
14   Riverside Drive in Johnson City or Binghamton.
15       Q.   Johnson City or Binghamton?
16       A.   Yes.  I'm not sure where the line crosses on
17   Riverside Drive because I know it does cross.  At some
18   point it goes from Johnson City to Binghamton.
19       Q.   Okay.  And is it Peter Orville,
20   O-R-V-I-L-L-E?
21       A.   As far as I know, yes.
22       Q.   Okay.  And were you successful in that
23   bankruptcy?
24       A.   I don't know.

Matthew Russell by Mr. Arleo

1      Q.    Do you remember going to Bankruptcy Court?

2      A.    Yes.

3      Q.    And what happened when you went to Bankruptcy

4   Court?

5      A.    We went through the process of being at the

6   courtroom.  The final -- final result, I'm not -- I

7   don't know what it was.

8      Q.    Okay.  Did you have debt listed in that

9   bankruptcy?

10     A.    I don't know what they are.

11     Q.    But did you have debts that were discharged

12  in that bankruptcy?

13     A.    Repeat the question.

14     Q.    Did you have debts discharged in your

15  bankruptcy?

16     A.    I don't know the answer with that.

17     Q.    And why did you file for bankruptcy?

18     A.    I didn't actually process the whole filing.

19  My wife did.

20     Q.    Okay.  Was that a joint bankruptcy with your

21  wife?

22     A.    I don't know how it was filed.

23     Q.    Was your wife part of that bankruptcy?

24     A.    I don't know.

Matthew Russell by Mr. Arleo

1        Q.    What's your wife's name?

2        A.    Jane Russell.

3        Q.    How long have you been married to her?

4        A.    Twenty-two years.

5        Q.    I'm sorry.  Mr. Russell, can you give me your

6   home address, please.

7        A.    ██████████████████████████████████

8        Q.    And your zip code, please.

9        A.    ██████.

10       Q.    Okay.  Back to the bankruptcy, did you have

11  any credit card debt listed in that bankruptcy?

12       A.    I don't know what the listings were.

13       Q.    Did you sign any bankruptcy papers?

14       A.    As a married man, I did what my wife told me

15  to do.

16       Q.    Okay.  Did you read the bankruptcy papers?

17       A.    My wife takes care of that.

18       Q.    That's not my question.  Did you read the

19  bankruptcy papers before you signed them?

20       A.    I recall I probably did, but I don't know.

21       Q.    Have you ever been convicted of a crime?

22       A.    No.

23       Q.    Have you ever been accused of any action

24  which would impugn your honesty and your integrity?

Matthew Russell by Mr. Arleo

1      A.   No.

2      Q.   Do you owe any back taxes?

3      A.   No.

4      Q.   Do you have children?

5      A.   I'm sorry.  Do I have children?

6      Q.   Yes.

7      A.   Yes.

8      Q.   Have you ever been married before your

9 present marriage?

10     A.   No.

11     Q.   Have you ever been held in contempt of any

12 court?

13     A.   No.

14     Q.   Have you ever been fired from any place of

15 employment?

16     A.   No.

17     Q.   Have you ever collected unemployment?

18     A.   Yes.

19     Q.   Do you recall when?

20     A.   Exact date, no.  Quite a while ago.

21     Q.   I'm sorry?

22     A.   I'm sorry, sir.  Quite a while ago.

23     Q.   Okay.  Thanks.  Do you own your home or rent?

24     A.   Own.

Matthew Russell by Mr. Arleo

1        Q.    And how long have you owned your home?

2        A.    Again, exact date, I don't know.  I'd be

3  guessing.

4        Q.    Why don't you take a guess, then.

5        A.    Eight years.

6        Q.    I'm sorry?

7        A.    Eight years.

8        Q.    Okay.  Have you ever had any bank accounts

9  seized?

10       A.    I don't know.

11       Q.    Have you ever had any judgments entered

12  against you?

13       A.    If I did, I don't know.

14       Q.    Okay.  Have your wages ever been garnished?

15       A.    No.

16       Q.    Does your wife work?

17       A.    Yes.

18       Q.    Where does she work?

19       A.    ██████████████████████

20       Q.    And what does she do for ████████

21       A.    ████████████████

22       Q.    I'm going to refer now to this lawsuit which

23  is filed against my client.  And what's the basis of

24  your claims against my client in this federal lawsuit?

14

Matthew Russell by Mr. Arleo

1        A.    To describe it, they had not contacted me

2    with information of a sale of my account.

3        Q.    Okay.  And why did you name Mark Garbus as a

4    defendant?

5        A.    Why did I name -- I don't know the exact

6    answer to that.

7        Q.    And why did you name Ronald Forster as a

8    defendant?

9        A.    I don't have the answer to that.

10                    MR. ARLEO:   Okay.  Court Reporter,

11               could you print out a copy of the complaint

12               that's been filed in this lawsuit, which is

13               United States District Court for the Eastern

14               District of New York.  That will give you

15               your caption that you requested before.

16                    (Whereupon a discussion was held

17               off the record)

18    BY MR. ARLEO:

19        Q.    Mr. Russell, what laws do you allege my

20    client violated?

21        A.    The laws -- I don't know the description of

22    that.  I can't describe that to you.

23        Q.    Okay.  What do you want from my client?

24        A.    I'd be assuming.  Are you asking me if I'm

Matthew Russell by Mr. Arleo

1    asking for money?

2         Q.   I'm asking you, what do you want from my

3    client from this lawsuit?

4         A.   The resolution of what's going on right now.

5         Q.   And how would that be resolved?

6         A.   For the sale of my name without telling me

7    about it.

8         Q.   So, what do you want from my client based on

9    this lawsuit?

10        A.   Do you have what my lawyer has presented to

11   you?

12        Q.   I'm not asking what your lawyer presented to

13   me.  I'm asking what you want from this lawsuit.

14        A.   I don't know.

15        Q.   Okay.  How many debts have you defaulted

16   upon?

17        A.   Don't have that in front of me.

18        Q.   Would it be more than one?

19        A.   I don't know.

20        Q.   Would it be more than five?

21        A.   I don't know.

22        Q.   Are you current on your mortgage payments?

23        A.   As far as I know.

24        Q.   Do you make the mortgage payments, or does

16

Matthew Russell by Mr. Arleo

1    your wife make them?

2             A.    My wife does.

3             Q.    And who has the mortgage on your home?

4             A.    Are you asking me what name is it under?

5             Q.    No.  I'm asking what lending institution gave

6    you the mortgage on your home.

7             A.    I don't know.  I don't have that in front of

8    me.

9             Q.    Is there a bank that gave you a mortgage?

10            A.    Yes.

11            Q.    And what bank is that?

12            A.    I don't know.

13            Q.    And how long have you owned your home for?

14            A.    Eight years.

15            Q.    How did you apply for that mortgage?

16            A.    When I applied, it was applied with my wife.

17   We applied together.

18            Q.    Did you sign any mortgage papers?

19            A.    I signed what I was told to sign by my wife.

20            Q.    And you don't know the bank that has your

21   mortgage?

22            A.    I don't have that information in front of me,

23   sir.

24            Q.    I'm asking you do you recall who the bank is

Matthew Russell by Mr. Arleo

1    that has your mortgage?

2         A.   I don't know right now.

3         Q.   Did you ever know?

4         A.   I'm assuming I did.

5         Q.   Is there a reason why you don't know now?

6         A.   I don't want to give you the wrong

7    information.

8         Q.   And you've testified that Mr. Pashkin is your

9    attorney in this lawsuit.  How did you retain

10   Mr. Pashkin?

11        A.   Through my wife.

12        Q.   And how did your wife come to learn of

13   Mr. Pashkin?

14        A.   I don't know.

15        Q.   And what did your wife tell you about

16   Mr. Pashkin?

17        A.   Friendly, polite.

18        Q.   And did Mr. Pashkin ever represent your wife?

19        A.   I'm sorry.  Did -- repeat the question.

20        Q.   Did Mr. Pashkin ever represent your wife?

21        A.   I don't know.

22        Q.   Again, how did your wife come to know

23   Mr. Pashkin?

24        A.   I don't know originally.

Matthew Russell by Mr. Arleo

1        Q.    Have you ever met Mr. Pashkin?

2        A.    By phone.

3        Q.    Okay.  When was the first time you spoke to

4    Mr. Pashkin?

5        A.    Again, estimation two months.

6                        (Whereupon a discussion was held

7               off the record)

8                        (Whereupon Exhibits 1 and 2 were

9               marked for identification)

10   BY MR. ARLEO:

11       Q.    Mr. Russell, did he sign a retainer agreement

12   with Mr. Pashkin?

13       A.    I did not.

14       Q.    And have you paid any money to him to date?

15       A.    No.

16       Q.    And what is your retainer agreement with

17   Mr. Pashkin?

18       A.    I don't know.  My wife would know.

19       Q.    So, how is Mr. Pashkin being paid for his

20   services rendered to you?

21       A.    I don't know.

22                       MR. ARLEO:  Can you, please, hand

23              him what's been marked as Exhibit 1, please.

24       Q.    And, Mr. Russell, can you just take a moment

Matthew Russell by Mr. Arleo

1    to review what's been marked as Defendant's Exhibit 1

2    and let me know when you're finished, please.

3         A.   I'm reading through the whole thing?

4         Q.   Yes, please.

5         A.   Okay.

6         Q.   And just let me when you're finished.

7         A.   Yes, sir.  Okay.  Sir.

8         Q.   I want to go back before we get into this

9    document.  When your wife said that Mr. Pashkin was

10   friendly, how did she come to know Mr. Pashkin?

11        A.   Through conversation.

12        Q.   And when was that conversation initiated?

13        A.   I don't know.

14        Q.   Did your wife receive any solicitations from

15   Mr. Pashkin?

16        A.   I don't know.

17        Q.   And now, you testified that the first time

18   you spoke to Mr. Pashkin was two months ago?

19        A.   That was an estimation.

20        Q.   And how did that conversation come to effect?

21        A.   Through my wife.

22        Q.   Explain that, please.

23        A.   My wife asked me to speak to Mr. Pashkin.

24        Q.   And why did she ask you to speak to him?

Matthew Russell by Mr. Arleo

1      A.    Because of the situation at hand.

2      Q.    What's the situation at hand?

3      A.    I was receiving letter -- I was told I was

4   receiving letters which I wasn't receiving.

5      Q.    So, you spoke to Mr. Pashkin about two months

6   ago?

7      A.    I've spoken to him more since.

8      Q.    Right.  But let's say on the first time and

9   you were not receiving letters.  Were they letters from

10  Mr. Pashkin?

11     A.    No.

12     Q.    And who were they letters from?

13     A.    The companies that were selling my name.

14     Q.    Okay.  You received letters from them?

15     A.    No.

16     Q.    Okay.  If you look at this document that's

17  been marked Defendant's Exhibit 1 and look at the top,

18  it says, document 1, filed 7/18 of '17.  When was the

19  first time you saw this document?

20     A.    Today.

21     Q.    So, you've never seen this complaint before?

22     A.    Actually in front of me, no.

23     Q.    Did you authorize Mr. Pashkin to bring a

24  class action in your name?

Matthew Russell by Mr. Arleo

1          A.    Yes.

2          Q.    When did you do that?

3          A.    I'm trying to give you a date.  I would say I

4     don't have a date right now.  I don't have a date.

5          Q.    Was it before this lawsuit was filed?

6          A.    I don't know.

7          Q.    Was it in the last month?

8          A.    I don't know.

9          Q.    Was it in the last two months?

10         A.    I don't know.

11         Q.    Have you reviewed any of the documents that

12    have been filed in this lawsuit?

13         A.    I just did.

14         Q.    So, this is the first time?  You haven't

15    reviewed any other documents in this lawsuit other than

16    this complaint?

17         A.    My wife handles most of that.

18         Q.    Did your wife receive any documents from

19    Mr. Pashkin?

20         A.    From Mr. Pashkin, I don't know.

21         Q.    Did your wife receive this complaint from

22    Mr. Pashkin?

23         A.    Yes.  I'm sorry.  I should say, yes, as far

24    as I know.  I -- she didn't say, I've got it, no.

22

Matthew Russell by Mr. Arleo

1       Q.    I'm sorry.  I didn't understand your answer.

2       A.    She didn't tell me the day she received it.

3       Q.    When did she receive it?

4       A.    I don't know.

5       Q.    And do you know what your responsibility is

6   as a class representative?

7       A.    No.

8       Q.    Has Mr. Pashkin ever explained those

9   responsibilities to you?

10      A.    I don't know.

11      Q.    This is a yes or no answer, Mr. Russell.  Has

12   he ever explained the responsibilities of class

13   representatives to you, yes or no?

14      A.    I don't know right now.

15      Q.    Well, when do you think you're going to know?

16      A.    I don't know right now.

17      Q.    Again, Mr. Russell, has Mr. Pashkin ever

18   explained to you your duties as a class representative?

19      A.    I don't know what -- I don't know.

20      Q.    Did he explain those duties to you prior to

21   July 18th of 2017?

22      A.    I don't know.

23      Q.    Mr. Russell, you're under oath.

24      A.    Yes.

Matthew Russell by Mr. Arleo

1        Q.    You understand that?

2        A.    Yes.

3        Q.    Okay.  And you've been sworn in?

4        A.    Yes.

5        Q.    Are you willing to pay your pro rata share of

6    costs if his lawsuit is not successful?

7        A.    I didn't hear that.

8        Q.    Are you willing to pay your pro rata share of

9    costs if his lawsuit is not successful?

10       A.    I don't know what that is.

11       Q.    Did Mr. Pashkin ever explain to you what that

12   is?

13       A.    I believe he explained something -- I believe

14   he explained something like that, but I don't know

15   that's what I'm -- if that's the answer I'm hearing.

16   If that was what he said to me, I don't know.

17       Q.    When you say, "he explained something like

18   that," explain what that meant.

19       A.    Well, I'm explaining to you that I don't know

20   what you're saying.  The pro rata share, what is that?

21       Q.    So, you don't know what pro rata shares are?

22       A.    Can you ask -- can you repeat the question

23   and tell me what that is.

24       Q.    No.  I'm asking you for your understanding of

Matthew Russell by Mr. Arleo


1    pro rata share, but we don't have to continue to go

2    around.  You don't know what pro rata share of costs

3    is, correct?

4         A.   I've never -- I've never heard the word pro

5    rata share to me, yes.

6         Q.   Okay.  Are you aware that my client is paying

7    money to depose you today?

8         A.   I don't know.

9         Q.   Okay.  Well, I'm letting you know that the

10   cost of the court reporter is going to be incurred in

11   this lawsuit.  Are you aware that if you lose this

12   lawsuit, you have to pay the costs incurred by my

13   client and not Mr. Pashkin?

14        A.   No.

15        Q.   Do you have your cell phone with you?

16        A.   I think so.

17        Q.   Okay.  Is there anyone communicating with

18   you?  Has anyone communicated with you during the

19   course of this deposition?

20        A.   No.

21        Q.   Have you received any text messages from

22   anyone during the course of this deposition?

23        A.   No.

24        Q.   Is there any other person besides Mr. Pashkin

Matthew Russell by Mr. Arleo

1   who may have a monetary interest in the legal fees in

2   this lawsuit?

3        A.   I don't know.

4        Q.   Has Mr. Pashkin told you that there's anyone

5   else involved in this lawsuit?

6        A.   No.

7        Q.   So, you've brought a class action.  What

8   persons are you trying to represent?

9        A.   Say that again.

10        Q.   Do you understand that this lawsuit against

11   my clients you started as a class action lawsuit?  Do

12   you understand that?

13        A.   Yes.

14        Q.   And who is the class you're trying to

15   represent?

16        A.   I don't have an answer for that.

17        Q.   So, would that mean you don't know who you're

18   trying to represent?

19        A.   I don't know what the answer -- I don't have

20   the answer that I think you're looking for.

21        Q.   I'm not looking for any answers, Mr. Russell.

22   I'm looking for you to respond to my question.

23        A.   I understand.

24        Q.   Yes or no, do you know the class that you're

Matthew Russell by Mr. Arleo

1    trying to represent in this lawsuit?

2         A.    The class is what?  What are you referring to

3    as the class?

4         Q.    What's your understanding of the class?

5         A.    What is the class?

6         Q.    That's what I'm asking you.

7         A.    What is -- what is the definition of the

8    class you're looking for?  Are you saying a person?

9         Q.    I'm asking you in this lawsuit what class are

10   you trying to represent?

11        A.    I don't know.

12        Q.    Has Mr. Pashkin ever told you the class that

13   you're trying to represent?

14        A.    I don't know.

15        Q.    And so we're clear, did you authorize

16   Mr. Pashkin to file this lawsuit in July of 2017?

17        A.    My wife did.

18        Q.    And have you spoken to your wife concerning

19   this lawsuit since July of 2017?

20        A.    I've spoken to my wife about speaking to

21   Mr. Pashkin.

22        Q.    And how many times have you spoken to her

23   about speaking to Mr. Pashkin?

24        A.    Too numerous to count.

Matthew Russell by Mr. Arleo

1      Q.    And when was the first time you spoke to her

2    after July of 2017 regarding this lawsuit?

3      A.    I'm guessing, again, a week later.

4      Q.    I'm sorry.  A week later from what?

5      A.    July of 2017.

6      Q.    A week after July of 2017 you spoke to your

7    wife about this lawsuit?

8      A.    Correct.  That was a guess.

9      Q.    Have you filed any other lawsuits against any

10   other debt collectors?

11     A.    No.

12     Q.    Have you settled any other lawsuits with any

13   other debt collectors?

14     A.    I don't know.

15     Q.    Okay.  Did you receive any money regarding

16   any settlements with any other debt collector lawsuits?

17     A.    I don't know.

18                    MR. ARLEO:   Okay.  Court Reporter,

19           can you show him defendant's Exhibit 2.

20     Q.    And, Mr. Russell, if you'd just take a

21   moment --

22     A.    Yes.

23     Q.    -- and review this and let me know when

24   you're done.

Matthew Russell by Mr. Arleo

1          A.    Okay, sir.

2          Q.    And when did you receive this lawsuit?

3          A.    When did I receive it?

4          Q.    Yes.

5          A.    I don't understand the question.

6          Q.    Have you ever seen this lawsuit before,

7     Defendant's Exhibit 2?

8          A.    I believe I have.  I don't know, though.

9          Q.    You believe you have, but you don't know?

10         A.    I believe it was shown to me by my wife.

11               Sorry I interrupted you.

12         Q.    No.  That's okay.  You're doing fine.

13               And was this lawsuit served on your wife?

14         A.    Was it served by my wife?

15         Q.    No.  Was it served -- how did your wife come

16    to get this lawsuit?

17         A.    Through Mr. Pashkin.

18         Q.    So, Mr. Pashkin sent this lawsuit to your

19    wife?

20         A.    I don't know.

21         Q.    I believe that's what you just testified to.

22         A.    I testified that I believed that she received

23    it from Mr. Pashkin, but I should say I don't know.

24                         (Whereupon there was an outside

Matthew Russell by Mr. Arleo


1               interruption)

2      BY MR. ARLEO:

3           Q.   Do you see at the top of this document it

4      says, defendant's address --

5           A.   Yes.

6           Q.   --                                        Is

7      that your address?

8           A.   Yes.

9           Q.   And what did you do in response to this

10     lawsuit?

11          A.   Spoke with Mr. Pashkin.

12          Q.   Okay.  Did you file an answer in this

13     lawsuit?

14          A.   I don't know.

15          Q.   And do you have an attorney in this lawsuit?

16          A.   Other than Mr. Pashkin?

17          Q.   Does Mr. Pashkin represent you in this LVNV

18     lawsuit?

19          A.   Yes.

20          Q.   And what is the status of that lawsuit?

21          A.   I don't know.

22          Q.   And do you have a retainer agreement with

23     Mr. Pashkin in this lawsuit?

24          A.   I don't know.

Matthew Russell by Mr. Arleo

1       Q.    Have you ever paid any of the moneys demanded
2  in this lawsuit?
3       A.    I don't know.
4       Q.    You don't know if you've paid any money?
5       A.    I don't -- I don't know.
6       Q.    Did you bring this federal lawsuit that's
7  Exhibit 1 in order to get out of paying the money you
8  owe in this lawsuit, which is Exhibit 2?
9       A.    No.
10      Q.    Would you settle Exhibit 1?
11      A.    Would I settle Exhibit 1?  Is that the
12 question?
13      Q.    Yes.
14      A.    I don't know.
15      Q.    Would you settle Exhibit 1 individually
16 without the class?
17      A.    Would I settle Exhibit 1 without the class?
18 I don't know.
19      Q.    Did you ever owe a debt to Credit One Bank
20 NA?
21      A.    I don't know.
22      Q.    Was that a credit card debt, that Credit One
23 Bank NA?
24      A.    Are you asking me or telling me?

31

Matthew Russell by Mr. Arleo

1      Q.    I'm asking was that a credit card?

2      A.    I don't know.

3      Q.    Do you recall ever using a credit card for

4    Credit One Bank NA?

5      A.    I do not.

6      Q.    Did you ever receive any collection letters

7    regarding this debt?

8      A.    No.

9      Q.    Did you ever receive any collection letters

10   from Forster & Garbus regarding this debt?

11     A.    I don't know.

12     Q.    Did your wife ever receive any collection

13   letters from Forster & Garbus regarding this debt?

14     A.    No.

15     Q.    Is your wife available for a deposition,

16   Mr. Russell?

17     A.    I don't know.

18                 MR. ARLEO:   I don't have any

19            further questions.

20                 MR. PASHKIN:   No questions here.

21                 (Whereupon the deposition concluded

22            at 10:02 AM)

23                        - - - - -

24

1    STATE OF _____

2    COUNTY OF _____

3

4        I have read the foregoing record of testimony

5    taken at the time and place indicated in the heading

6    thereof, and I do hereby acknowledge it to be a true

7    and correct transcript thereof.

8

9                              _____

10                             MATTHEW RUSSELL

11

12

13   Subscribed and sworn to

14   before me this _____ day

15   of _____, 20__.

16

17   _____

18        NOTARY PUBLIC

19

20

21

22

23

24

1                          I N D E X

2

3      EXHIBIT:                                        PAGE:

4      1      US District Court complaint document       19

5      2      Lawsuit document – LVNV Funding v           27

6             Russell

7                          -  -  -  -  -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

34

1    STATE OF NEW YORK      :

2    COUNTY OF BROOME       :

3

4              I, KEVIN CALLAHAN, Shorthand Reporter, do

5    certify that the foregoing is a true and accurate

6    transcript of the proceedings in the matter of

7    Matthew Russell, On Behalf of Himself and All Others

8    Similarly Situated, v Forster & Garbus, LLP, LVNV

9    Funding, LLC, Sherman Financial Group, LLC, Mark A.

10   Garbus, and Ronald Forster, held in Binghamton,

11   New York, on February 21, 2019.

12

13

14          _____

15          KEVIN CALLAHAN

16          Shorthand Reporter

17          Notary Public

18          CZERENDA COURT REPORTING, INC

19          71 State Street

20          Binghamton, New York 13901-3318

21

22

23

24